# IN THE SUPREME COURT OF IOWA

No. 18–2201

Filed June 30, 2020

**DARREN PETRO,**

Appellant,

vs.

**PALMER COLLEGE OF CHIROPRACTIC,**

Appellee.

_____

Appeal from the Iowa District Court for Scott County, Mary E. Howes (motion to dismiss) and Stuart P. Werling (summary judgment), Judges.

An individual appeals the dismissal of his civil rights action against an educational institution he formerly attended. **AFFIRMED.**

Thomas J. Duff and Jim T. Duff of Duff Law Firm, P.L.C., West Des Moines, for appellant.

Mikkie R. Schiltz and Alexander C. Barnett of Lane & Waterman, LLP, Davenport, for appellee.

Latrice L. Lacey, Davenport, for amicus curiae Iowa League of Civil and Human Rights Agencies.

**MANSFIELD, Justice.**

This case presents an important question about the extent to which municipalities can confer state-court jurisdiction over individual lawsuits. In particular, does state law authorize municipalities to give state courts jurisdiction over private claims under municipal civil rights ordinances?

A student who attended a chiropractic college contends he was discriminated against on the basis of age and disability and ultimately had to leave the school. In 2014, he lodged a complaint with the Iowa Civil Rights Commission (ICRC). The complaint was screened out and administratively closed, but the student did not seek a right-to-sue letter. Instead, he filed an identically worded complaint with the local civil rights commission. Notably, while both state and local law prohibit disability discrimination, only the local civil rights ordinance prohibits discrimination in education on the basis of age.

Three years later, in 2017, the local commission completed its investigation and found probable cause to believe violations of the local ordinance had been committed. It declined to take the matter to a public hearing, however. Instead, at the student's request, the local commission issued a right-to-sue letter under the local ordinance.

The student subsequently brought claims in district court for violations of the local ordinance, violations of the Iowa Civil Rights Act (ICRA), and breach of contract. The district court dismissed all claims, reasoning that it had no jurisdiction over the local ordinance claims, that the ICRA claims were barred because they were the second round of claims based on the same conduct, and that the student did not have a viable breach of contract claim. The student appeals.

On our review, we affirm. We conclude that home rule in Iowa generally stops at the point where a municipality attempts to bring about

enforceable legal relations between two private parties. For a municipality to enact law that would be binding between those parties in state court, specific authorization from the general assembly is needed. After a close review, we also conclude that the ICRA does not contain such authorization. Additionally, we agree with the district court's resolution of the ICRA and breach of contract claims. Accordingly, we affirm the judgment below.

## I. Background Facts & Proceedings.

**A. Overview of the Dispute.** Darren Petro enrolled as a student at Palmer College of Chiropractic (Palmer) in Davenport in the spring of 2012. Petro was a nontraditional student. Prior to enrolling at Palmer, Petro served as an officer in the United States Navy and as both a civil servant and contract consultant with the Central Intelligence Agency. Petro sustained a lower back injury while serving in Iraq in 2009. At the time of enrollment, Petro was forty-four years old.

Petro contends that during his time at Palmer, various faculty commented on his age. Petro also maintains that during a cervical technique class, he received derogatory comments because of his lower back injury. In January 2014, Petro contends he was falsely accused of an ethics violation. The following month, according to Petro, a false text message was passed around stating that Petro had threatened two women professors. At that point, Petro left the Palmer campus and did not return.

The gist of Petro's civil claim is that Palmer engaged in a series of discriminatory acts based on age and real or perceived disability while Petro was a student. Petro also alleged Palmer engaged in unlawful retaliatory actions when he complained about the discriminatory conduct.

In Palmer's online application form, a "Notice" appears that includes the following statement:

In order to provide an environment that encourages respect, dignity, and equal opportunity and is in compliance with applicable federal and state laws and regulations, Palmer College of Chiropractic and its respective colleges do not discriminate in employment or in educational programs, services or activities on the basis of age, race, creed, color, sex, national origin, ancestry, citizen status, religion[,] disability, veteran status or other characteristics protected by law.

Palmer's Board of Trustees required the college's executive administration to develop, institute, and enforce institutional policies to govern the operations of the college. At the time of Petro's attendance, Palmer had adopted a policy regarding equal opportunity. The opening statement of the policy provided that

Palmer College of Chiropractic (College) does not discriminate in employment, admissions or in educational practices, programs, services or activities on the basis of age, ancestry, citizenship status, color, creed, disability, national origin, race, religion, sex, sexual orientation, gender identity; veteran status or other characteristic protected by law in the state in which the applicable College premise is located.

The equal opportunity statement was incorporated into the student handbook at Palmer. Petro claims that these statements created a contractual obligation on Palmer to comply with antidiscrimination law.

**B. Petro's First Complaint Filed with the Iowa Civil Rights Commission.**

1. *Substance of Petro's first complaint.* After withdrawing from Palmer, Petro filed his first civil rights complaint with the ICRC on April 24, 2014. In his answers on the complaint form filed with the ICRC, Petro stated "Yes" to the question of whether he believed he was discriminated against because of a "disability, real or perceived." Petro also stated, "I have low back pain and physical restrictions caused by an injury from military service." To a question asking whether he was discriminated against based on age in employment or credit, he answered "Yes." Petro

also answered "Yes" to a question regarding whether he had been retaliated against as a result of complaining about discrimination. He claimed on the questionnaire that he was "constructively expelled" from Palmer.

2. *Action of ICRC on first complaint.* The ICRC screened out Petro's claim as not warranting investigation. The ICRC staff reasoned that age is not a protected class under the education section of the ICRA. While the ICRC staff reasoned that Petro might have a disability arising out of his back injury, the evidence submitted in the screening process did not "demonstrate a reasonable possibility of a probable cause determination." The ICRC staff noted that Petro had received a favorable grade in the cervical technique class. The ICRC administratively closed the file on September 18. Petro did not request a right-to-sue letter from the ICRC at that time.

**C. Petro's Second Complaint Filed with the Davenport Civil Rights Commission and Cross-Filed with the ICRC.**

1. *Substance of Petro's second complaint.* Instead, less than a month later, on October 10, Petro brought a second civil rights complaint, although this time with the Davenport Civil Rights Commission (DCRC). Soon thereafter, the DCRC cross-filed Petro's second complaint with the ICRC. Petro's complaint with the DCRC was supported by exactly the same four-page narrative that Petro had attached to his ICRC complaint.

2. *Action of DCRC on second complaint.* Almost three years after the complaint was filed, the director of the DCRC issued a finding of probable cause on July 17, 2017. The director provided a forty-three-page analysis of the facts and her conclusions. According to the DCRC director, there was sufficient evidence to support Petro's discrimination claims based upon disability and retaliation. Among other things, the director found

that the ethics charge was "questionable"; that Palmer's employees did not believe Petro posed a physical threat, although one woman in the administration had begun to feel "intimidated and disrespected" at a meeting; and that there had been no need for a security alert regarding Petro. The director also faulted Palmer for not taking adequate action when an outside contractor's security guard sent a defamatory text message about Petro to a Palmer student. (The security guard had a relationship with that Palmer student, and the text was subsequently disseminated among other Palmer students.) The director initially found no probable cause for discrimination based upon age. However, on September 26, the DCRC director amended her previous finding and found probable cause to support Petro's age discrimination claim as well.

After DCRC-sponsored conciliation failed, the DCRC on October 10 declined to hold a public hearing on Petro's complaint and instead issued an administrative closure of the file. In a letter to Petro's counsel, the DCRC stated,

> An administrative closure is not a final determination of the merits of the case but merely a determination based on the limited resources of the commission. However, it does not mean that your client is without a remedy.
>
> A complainant who wishes to take the case into district court can do so by requesting a right to sue letter from the Davenport Civil Rights Commission before 2 years have elapsed from the issuance date of the administrative closure.

Petro obtained a right-to-sue letter from the DCRC on October 19 and filed suit in the Iowa District Court for Scott County on January 16, 2018.

### D. District Court Litigation.

1. *Initial proceedings.* Petro's original petition alleged discriminatory practices by Palmer exclusively under the Davenport civil

rights ordinance, Davenport Municipal Code chapter 2.58. Count I charged age discrimination and harassment, count II charged disability discrimination and harassment, and count III charged retaliation by Palmer for Petro's complaints. On January 25, Palmer promptly filed a motion to dismiss the action, asserting that the ICRA did not authorize a district court to hear a direct action brought by a complainant arising from a right-to-sue letter issued by a local commission such as the DCRC.

2. *Petro obtains right-to-sue letter from ICRC and amends district court complaint.* After receiving Palmer's motion to dismiss, Petro sought and obtained a right-to-sue letter from the ICRC based upon the cross-filing of his second complaint with the state agency. He then amended his petition on January 30, adding allegations that Palmer's actions constituted disability discrimination, harassment, and retaliation under the ICRA, plus a breach of contract claim against Palmer.

Palmer unsuccessfully attempted to convince the ICRC to reconsider its issuance of the right-to-sue letter. The ICRC rejected the request in a March 9 summary order and notice.

Back in the district court, Palmer sought a stay of Petro's case in order to challenge the validity of the right-to-sue letter issued by the ICRC in a judicial review proceeding under the Iowa Administrative Procedures Act (IAPA), Iowa Code chapter 17A. *See* Iowa Code § 17A.19 (2017). The district court granted the stay, and Palmer brought the IAPA action.

3. *Disposition of IAPA action.* In the IAPA action, Palmer challenged the ICRC's March 9 summary order and notice denying reopening. According to Palmer, the ICRC did not have the authority to issue Petro a right-to-sue letter because his second complaint was repetitive and thus filed contrary to Iowa Code section 216.19(6).

On August 14, the district court in the IAPA action upheld the right-to-sue letter issued by the ICRC and dismissed Palmer's claim. The district court stated, however, that the question of whether the second complaint was duplicative of Petro's first civil rights claim could be raised in the pending Petro action. The district court indicated that Palmer was not barred "from raising its duplicative arguments under Iowa Code § 216.19(6) in Petro's district court case, Scott County Case No. CVCV297911." Ten days later, the district court in Petro's case lifted the stay and proceedings resumed.

4. *Disposition of underlying litigation on the merits.* On November 30, the district court granted Palmer's motion to dismiss. It held that the ICRA did not authorize a district court to hear an action brought by a private party pursuant to a right-to-sue letter issued by a local civil rights agency. The court reasoned that Iowa Code section 216.19 "provides an aggrieved plaintiff the right to petition the district court for *judicial review* of a [local] civil rights commission's decision," but "does not provide for a *general civil cause of action* for an aggrieved plaintiff for wrongs alleged solely under municipal ordinances." As a result, the district court dismissed Petro's claims under the Davenport civil rights ordinance.

Meanwhile, Palmer had filed a motion for summary judgment on the remaining claims. One week later, on December 7, the district court granted Palmer's motion for summary judgment on all claims under the ICRA and on the breach of contract claim. As to the ICRA claims, the district court found they were barred by Iowa Code section 216.19(6), which prohibits someone who files a complaint with the ICRA from "filing a complaint with the referral agency alleging violations based upon the same acts or practices cited in the original complaint." The court pointed

out that Petro's first civil rights complaint (filed with the ICRC) and his second civil rights complaint (filed with the DCRC and subsequently cross-filed with the ICRC) were based on an identical four-page narrative; therefore, Petro could not pursue the second complaint, which was the basis for his district court action. In addition, the court found no basis for a breach of contract claim.

Petro appealed, and we retained the appeal.

## II. Standard of Review.

"We review rulings on motions to dismiss for correction of errors at law." *Karon v. Elliott Aviation*, 937 N.W.2d 334, 339 (Iowa 2020). "We review a district court's ruling on subject matter jurisdiction for correction of errors at law." *Ney v. Ney*, 891 N.W.2d 446, 450 (Iowa 2017). "A ruling on summary judgment is reviewed for correction of errors at law." *Munger, Reinschmidt & Denne, L.L.P. v. Lienhard Plante*, 940 N.W.2d 361, 365 (Iowa 2020). "Summary judgment is appropriate when the record shows no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Id.*

## III. Jurisdiction of District Courts to Hear Private Actions Under Local Civil Rights Ordinances.

**A. Municipal Authority to Create Private Rights of Action in Iowa.** This case presents the question whether a municipality can confer district court jurisdiction on a claim by one private party against another under that municipality's civil rights ordinance. Article III, section 38A of the Iowa Constitution and Iowa Code section 364.1 grant home rule authority to cities. However, section 364.1 also provides that the grant of home rule power to cities "does not include the power to enact private or civil law governing civil relationships, except as incident to an exercise of an independent city power." Iowa Code § 364.1; *see* Gary T. Schwartz, *The*

*Logic of Home Rule and the Private Law Exception*, 20 UCLA L. Rev. 671, 696 (1973) (explaining that this language refers to "the relationship between plaintiff and defendant in a civil private lawsuit").

In *Molitor v. City of Cedar Rapids*, we addressed "whether a city has power to confer jurisdiction in the district court by city ordinance." 360 N.W.2d 568, 568 (Iowa 1985). We said no and thus rejected an effort by a citizen to appeal an adverse ruling of the Cedar Rapids housing board to the district court, as authorized by the Cedar Rapids housing ordinance. *Id.* We explained that "[t]he Iowa district court is a state court. Its jurisdiction is conferred by the constitution and by legislation." *Id.* at 569. We added,

> The constitutional and statutory framework makes jurisdiction of state courts "a state affair rather than a municipal affair." If municipal corporations had the power to confer jurisdiction on the district court, the jurisdiction of the court potentially could be fragmented into as many components as there are municipalities.
>
> . . . Municipal power over local and internal affairs does not include authority to determine the jurisdiction of a state court. We find no basis in the constitution or statutes for holding otherwise.

*Id.* (quoting 2 Eugene McQuillan, *The Law of Municipal Corporations* § 4.95, at 165 (1979)).

**B. Iowa Code Section 216.19.** Despite the categorical nature of what we said in *Molitor*, Petro insists that municipal *civil rights* ordinances are different. In the ICRA, according to Petro, the general assembly empowered municipalities to issue right-to-sue letters allowing private parties to sue for violations of municipal civil rights ordinances.

Since 1978, a complainant may request from the ICRC an administrative release or "right to sue" letter. Iowa Code § 216.16; *see also* 1978 Iowa Acts ch. 1179, § 1 (then codified at Iowa Code § 601A.16 (1979),

now codified as amended at Iowa Code § 216.16 (2017)).  By obtaining the right-to-sue letter, the complainant obtains the right to directly file an action in district court alleging violations of the ICRA.  Iowa Code § 216.16. There is no prior final agency determination, however, and the district court proceeding is de novo.  *Id.*  With a right-to-sue letter, the complainant controls the enforcement of the claim but ordinarily must hire a lawyer to represent them in the litigation.  *See id.*

In considering Petro's contentions, we begin with the text of the ICRA.  Iowa Code section 216.19, entitled "Local laws implementing this chapter," addresses local civil rights agencies such as the DCRC.  *Id.* § 216.19.  It provides as follows:

> 1. All cities shall, to the extent possible, protect the rights of the citizens of this state secured by the Iowa civil rights Act.  Nothing in this chapter shall be construed as indicating any of the following:
>
> *a.* An intent on the part of the general assembly to occupy the field in which this chapter operates to the exclusion of local laws not inconsistent with this chapter that deal with the same subject matter.
>
> *b.* An intent to prohibit an agency or commission of local government having as its purpose the investigation and resolution of violations of this chapter from developing procedures and remedies necessary to insure the protection of rights secured by this chapter.
>
> *c.* Limiting a city or local government from enacting any ordinance or other law which prohibits broader or different categories of unfair or discriminatory practices.
>
> 2. A city with a population of twenty-nine thousand, or greater, shall maintain an independent local civil rights agency or commission consistent with commission rules adopted pursuant to chapter 17A.  An agency or commission for which a staff is provided shall have control over such staff. A city required to maintain a local civil rights agency or commission shall structure and adequately fund the agency or commission in order to effect cooperative undertakings with the Iowa civil rights commission and to aid in effectuating the purposes of this chapter.

3. An agency or commission of local government and the Iowa civil rights commission shall cooperate in the sharing of data and research, and coordinating investigations and conciliations in order to expedite claims of unlawful discrimination and eliminate needless duplication. The Iowa civil rights commission may enter into cooperative agreements with any local agency or commission to effectuate the purposes of this chapter. Such agreements may include technical and clerical assistance and reimbursement of expenses incurred by the local agency or commission in the performance of the agency's or commission's duties if funds for this purpose are appropriated by the general assembly.

4. The Iowa civil rights commission may designate an unfunded local agency or commission as a referral agency. A local agency or commission shall not be designated a referral agency unless the ordinance creating it provides the same rights and remedies as are provided in this chapter. The Iowa civil rights commission shall establish by rules the procedures for designating a referral agency and the qualifications to be met by a referral agency.

5. The Iowa civil rights commission may adopt rules establishing the procedures for referral of complaints. A referral agency may refuse to accept a case referred to it by the Iowa civil rights commission if the referral agency is unable to effect proper administration of the complaint. It shall be the burden of the referral agency to demonstrate that it is unable to properly administer that complaint.

6. A complainant who files a complaint with a referral agency having jurisdiction shall be prohibited from filing a complaint with the Iowa civil rights commission alleging violations based upon the same acts or practices cited in the original complaint; and a complainant who files a complaint with the commission shall be prohibited from filing a complaint with the referral agency alleging violations based upon the same acts or practices cited in the original complaint. However, the Iowa civil rights commission in its discretion may refer a complaint filed with the commission to a referral agency having jurisdiction over the parties for investigation and resolution; and a referral agency in its discretion may refer a complaint filed with that agency to the commission for investigation and resolution.

7. A final decision by a referral agency shall be subject to judicial review as provided in section 216.17 in the same manner and to the same extent as a final decision of the Iowa civil rights commission.

8. The referral of a complaint by the Iowa civil rights commission to a referral agency or by a referral agency to the

Iowa civil rights commission shall not affect the right of a complainant to commence an action in the district court under section 216.16.

*Id.*

The only provision directly addressing right-to-sue letters is section 216.19(8). *See id.* § 216.19(8). It is worded as a savings clause ("shall not affect"). *See id.* It preserves a complainant's otherwise existing right to sue, but it doesn't create an additional right to sue such as a right to sue under an ordinance. *See id.* And it only preserves a right to sue under section 216.16. *See id.* Section 216.16, as already noted, concerns right-to-sue letters under the ICRA. It refers to an "unfair or discriminatory practice," a term of art that means a violation of the ICRA. *Id.* §§ 216.2(15), .16(1). It then authorizes the ICRC's issuance of "a release stating that the complainant has a right to commence an action in the district court." *Id.* § 216.16(3)(*a*). Iowa Code section 216.16(3) authorizes the right-to-sue letter. Section 216.16 does not authorize a complaining party to sue for a violation of a municipal ordinance.

Furthermore, "we read statutes as a whole." *Iowa Ins. Inst. v. Core Grp. of the Iowa Ass'n for Justice*, 867 N.W.2d 58, 72 (Iowa 2015). Iowa Code section 216.19(7) provides that "[a] final decision by a referral agency shall be subject to judicial review . . . in the same manner and to the same extent as a final decision of the Iowa civil rights commission." This shows the legislature knew how to confer district court jurisdiction over local civil rights matters when it wanted to. The legislature could have provided in section 216.19(8) that a complainant to a local referral agency would have the right to sue for violation of a local civil rights ordinance "in the same manner" as a complainant to the ICRC. It did not.

It is true that Iowa Code section 216.16 does not directly *preclude* a local civil rights commission from issuing a right-to-sue letter under a local

ordinance. But given *Molitor* and section 364.1, there must be something more—an affirmative grant of authority from the general assembly. And the affirmative provision for judicial review in section 216.19(7) suggests, by negative implication, that the general assembly did not envisage a judicial forum in other contexts.

Notably, both concepts at issue—the right to sue and the local referral agency—were added in 1978 by the same legislation. *See* 1978 Iowa Acts ch. 1179 §§ 1, 21 (then codified at Iowa Code §§ 601A.16, .19 (1979), now codified as amended at Iowa Code §§ 216.16, .19 (2017)). What became section 216.19(8) was part of that legislation. *See id.* § 21 (then codified at Iowa Code § 601A.19 (1979), now codified at Iowa Code § 216.19(8) (2017)). Logically, therefore, section 216.19(8) defines when a right to sue is available to a civil rights complainant whose complaint goes through a local referral agency. When two subjects are covered by the same legislation and the legislature takes the time to spell out the interplay between those two subjects, as it did in section 216.19(8), we should be hesitant to add to what the legislature wrote. To the extent the text of Iowa Code section 216.19 is ambiguous, this legislative history supports the foregoing interpretation. *See* Iowa Code § 4.6(3) (2017).

A published opinion of the United States District Court for the Southern District of Iowa makes several of these points. *See Toppert v. Nw. Mech., Inc.*, 968 F. Supp. 2d 1001, 1010–11 (S.D. Iowa 2013). *Toppert* found the ICRA did not authorize private actions to enforce municipal civil rights ordinances. *Id.* The *Toppert* court explained,

> Iowa Code § 216.19(7) states: "A final decision by a referral agency shall be subject to judicial review as provided in section 216.17 in the same manner and to the same extent as a final decision of the Iowa civil rights commission." Reading this provision in conjunction with § 216.19(1)(c), which states that the ICRA does not prevent a municipality

from protecting broader or different categories of discrimination, makes it clear that judicial review is available for violations of not only the ICRA, but also violations of local ordinances. This is in contrast to the only subsection in Iowa Code § 216.19 that refers to an administrative release, right to sue letter or ability to commence an action in district court; that subsection is Iowa Code § 216.19(8).

Iowa Code § 216.19(8) states: "The referral of a complaint by the Iowa civil rights commission to a referral agency or by a referral agency shall not affect the right of a complainant to commence an action in the district court under section 216.16." The Iowa Supreme Court has not clearly spoken, but a natural interpretation is that a complainant does not lose her right to sue in district court under the ICRA when a referral or a deferral agency handles her investigation and/or resolution of the case. The provision cannot reasonably be read to empower a local commission with authority to issue its own right to sue letters under its local ordinance because the provision explicitly says "commence an action *under Chapter 216.16*," indicating that the action is for a violation of the ICRA.

*Id.* (citations omitted). Although *Toppert* is not binding on us, its analysis parses the statutes in the same way as we do.

Lastly, it does not appear that a decision holding that municipalities cannot issue right-to-sue letters under municipal civil rights ordinances would throttle municipal civil rights enforcement. *See* Iowa Code §§ 4.4(3), .6(5). According to the DCRC's most recent annual reports, it has issued only one or two right-to-sue letters a year, representing approximately 1% or, at most, 1.5% of its caseload. *See* Davenport Civil Rights Comm'n, 2017 Annual Report 22, 2016 Annual Report 16, https://cityofdavenportiowa.com/cms/one.aspx?portalId=6481456&pageId=10025497. Elsewhere, the Iowa City Human Rights Commission issued no right-to-sue letters in the last two reporting years. *See* Iowa City Human Rights Comm'n, Annual Report FY2018 7, https://www.icgov.org/city-government/boards/human-rights-commission. The Cedar Rapids Civil Rights Commission issued one right-to-sue letter in the last two reporting years. *See* Cedar Rapids Civil Rights

Comm'n, 2019 Annual Report 22, 2018 Annual Report 22, http://www.cedar-rapids.org/local_government/city_boards_and_commissions/publications.php. The ICRC, by contrast, has recently issued approximately 150 to 200 right-to-sue letters per year, representing approximately 10% to 15% of its overall caseload. *See* Iowa Civil Rights Comm'n, Annual Report Fiscal Year 2019 14, https://icrc.iowa.gov/document-type/annual-reports. Indeed, Petro could have obtained a right-to-sue letter from the ICRC on his first complaint in 2014. He elected not to.

To the extent that denying right-to-sue letters under local ordinances restricts private enforcement of local civil rights ordinances, one has to ask whether that might have been the legislature's plan. In the end, rights to sue under local ordinances matter only when the local ordinance is broader than the ICRA. Otherwise, the existing right to sue under the ICRA suffices. But the legislature might have been concerned that allowing local commissions to create additional protected classes— *and then to authorize private suits for discrimination based on these forms of protected status*—might have been too much too soon. For example, what if a municipality decided to ban discrimination based on individual's credit score? The legislature might have been willing to accept this exercise of municipal autonomy to the extent the local commission was willing to enforce the ban itself but did not want a tide of private litigation.

In arguing that local civil rights agencies can authorize suits for violations of local ordinances, Petro relies primarily on Iowa Code sections 216.19(1)(*b*) and (*c*). We think the reliance is unavailing. True, section 216.19(1)(*b*) appears to allow for flexibility in local agency "procedures and remedies." *See id.* § 216.19(1)(*b*). But if we study the actual language, it refers to "an agency or commission of local government

. . . developing procedures and remedies necessary to insure the protection of rights *secured by this chapter.*" *Id.* (emphasis added). Petro's case involves, in part, a right to attend an educational institution regardless of age. That is not a "right[] secured by this chapter," i.e., chapter 216. It is a right conferred only by the Davenport civil rights ordinance.

Furthermore, Iowa Code section 216.19(1)(*b*), like Iowa Code section 216.19(8), is a form of savings clause. Again, we focus on the words themselves. They state that "[n]othing in this chapter shall be construed as indicating . . . [a]n intent to prohibit" the development of local procedures and remedies. *Id.* Thus, section 216.19(1)(*b*) is not an independent grant of authority to cities to enact local law governing relationships between private parties such as Petro and Palmer. At best, it allows such local law to stand if there is an independent basis for it. As *Molitor* holds, a municipality that wants to regulate conduct between private parties and confer jurisdiction on the state courts to adjudicate such a dispute needs a wellspring in state law for doing so. Otherwise, chapter 364 closes the door.

Likewise, it's true that Iowa Code section 216.9(1)(*c*) allows local agencies to "prohibit[] broader or different categories of unfair or discriminatory practices" than the ICRA. But an agency's authority to *prohibit* other practices should not be confused with authority to *grant private rights of action*—which is expressly covered by section 216.9(8). *See also Baker v. City of Iowa City*, 750 N.W.2d 93, 101 (Iowa 2008) (stating that this provision "expressly allows cities latitude only with respect to discriminatory *practices*"). In short, neither of these provisions confers the authority Davenport purported to exercise here.[1]

---

[1]Petro also invokes Iowa Code section 216.18(1), which provides, "This chapter shall be construed broadly to effectuate its purposes." We do not read this language as

Overall, Petro utilizes the wrong analytical framework. He contends that "[t]he [l]egislature did not intend to prohibit the enforcement of local civil rights laws in district court." But that is the wrong question because, in light of *Molitor*, the legislature had to do more. It had to affirmatively authorize the private enforcement of local civil rights laws in district court.

Petro does not rely on Iowa Code section 216.19(4), but the amicus curiae Iowa League of Civil and Human Rights Agencies has invoked this provision. One could argue that the League's position has been waived since the appellant did not urge it. *See Rants v. Vilsack*, 684 N.W.2d 193, 199 (Iowa 2004) (holding that an issue is not preserved if only argued by an amicus curiae). However, we will credit Petro's briefing with raising the overall question whether Iowa Code section 216.19 authorizes suits under local ordinances. Under the practical approach that we follow, the entire section, including subsection (4), is properly before us.

Iowa Code section 216.19(4) requires a local referral agency to afford "the same rights and remedies as are provided in this chapter." The League maintains this language requires a municipality to provide a right to sue under its civil rights ordinance. We agree that the right to sue is a "right[] and remed[y]." The relevant question, though, is whether the municipal ordinance must provide a right to sue *under chapter 216* or whether this language authorizes—indeed requires—municipalities to provide rights to sue *under their own civil rights ordinances*, regardless how broadly those ordinances might sweep.

The words "rights and remedies" in Iowa Code section 216.19(4) are somewhat vague and general. Sections 216.19(7) and 216.19(8) are more

---

authorizing a private right to action to enforce a local civil rights ordinance in light of the language in sections 216.19(7) and 216.19(8) withholding that right. We also do not believe it was a purpose of the ICRA to create previously nonexistent private rights of action to enforce local civil rights ordinances that may establish substantive rights and remedies quite different from those in the ICRA.

specific. *See id.* § 216.19(7)–(8). To the extent these provisions conflict, we should give greater weight to the more specific provisions. *See id.* § 4.7.

Another point worth pondering is this: It makes sense for the local civil rights commission to have authority to issue a right-to-sue letter *under the ICRA* when a complaint is referred to it by the ICRC. That enables a complete referral of the case. It avoids the situation where the ICRC might be issuing a right-to-sue letter for a case that is being actively investigated by the local commission. But what underlying policy consideration would have motivated the general assembly to *require* (not merely permit) private enforcement of substantive rights that the general assembly had itself declined to recognize? That seems odd.

In *Gray v. Kinseth Corp.,* a complaint was filed with the Council Bluffs Human Rights Commission and cross-filed with the ICRC. 636 N.W.2d 100, 101 (Iowa 2001). The ICRC sent a letter to the Council Bluffs commission indicating that it would "await results of [its] processing." *Id.* However, the box to indicate whether the ICRC was making a referral or a deferral was not checked. *Id.* Both the ICRC and the local commission later issued right-to-sue letters with different deadlines for filing suit. *Id.* at 101–02. The plaintiff's lawsuit was timely only under the ICRC letter. *Id.* at 102. Thus, we had to decide whether the ICRC's right-to-sue letter was valid or whether it had been rendered ineffective by the ICRC's prior referral of the case to the local agency. *Id.* We held that a local agency could have authority to issue a right-to-sue letter to enforce the ICRA but only if there had been an actual referral from the ICRC. *Id.* at 102–03. Since there was no binding referral, the ICRC right-to-sue letter was valid, the local agency did not have authority to issue a right-to-sue letter under the ICRA, and the plaintiff's lawsuit was timely. *Id.* at 103. Here is the key language:

Gray contends there is no statutory authority for a local commission to issue an administrative release that would preempt a plaintiff's right to sue under the Iowa Civil Rights Act. Rather, he claims, such a release by a local commission would limit a plaintiff's right only under a local ordinance. Gray cites *Quaker Oats Co. v. Cedar Rapids Human Rights Commission*, 268 N.W.2d 862, 864 (Iowa 1978), to support this argument. The statute cited by *Quaker Oats* was amended in 1978 (and later moved to section 216.19), and now it appears that, pursuant to section 216.19, local commissions have jurisdiction to enforce the Iowa Civil Rights Act as well as local ordinances. Part of the new language reads:

> Nothing in this chapter shall be construed as indicating an intent to prohibit an *agency or commission of local government* having as its purpose the investigation and resolution of violations of *this chapter* from developing procedures and remedies necessary to insure the protection of rights secured by *this chapter. All cities shall,* to the extent possible, *protect the rights* of the citizens of this state *secured by the Iowa civil rights Act.* Nothing in this chapter shall be construed as limiting a city or local government from enacting any ordinance or other law which prohibits broader or different categories of unfair or discriminatory practices.

Iowa Code § 216.19 (1995) (emphasis added).

> We believe the local commission here has authority to enforce the Iowa Civil Rights Act, under Iowa Code chapter 216. This, however, does not mean the local commission has replaced the state commission.

*Id.* at 102–03 (footnote omitted).

In other words, we opined that the local commission did have authority to issue right-to-sue letters under the ICRA. *Id.* However, the concern in *Gray* was that there had not been a referral (as opposed to a deferral) from the ICRC. *Id.* at 103. *Gray* stands for the proposition that local civil rights agencies acting as referral agencies can issue right-to-sue letters under the ICRA but does not decide whether local agencies can issue such letters under local civil rights ordinances.

In light of *Gray*, a right to sue under a local ordinance matters only when the local ordinance provides substantive rights and remedies that the ICRA *doesn't* provide—i.e., the situation with respect to Davenport. Otherwise, the complainant can receive a right-to-sue letter under the ICRA, either from the ICRC or the local agency, which provides every private right of action the complainant might want or need. *See id.* at 102–03. When Davenport decided to prohibit age discrimination in education—a right that doesn't exist in Iowa Code chapter 216—it established an *additional* right not recognized by state law. An ordinance that creates an additional right and allows private suits to enforce it isn't providing for "the same rights and remedies." Iowa Code § 216.19(4). Instead, it is providing something more. So, unless "same" in section 216.19(4) means "greater," we cannot accept the League's reading of the statute.

The League also directs us to Iowa Code section 216.19(1) which states, "All cities shall, to the extent possible, protect the rights of the citizens of this state secured by the [ICRA]." But this argument does not advance the discussion very much. In part, we are not talking here about a right secured by the ICRA. Also, this opening exhortation in section 216.19 begs the question of what is "possible." Iowa law limits municipal creation of "private or civil law governing civil relationships." Iowa Code § 364.1. We find nothing in section 216.19 to overcome that.

**C. Other Considerations.** We acknowledge that in *Dietz v. Dubuque Human Rights Commission*, 316 N.W.2d 859, 861–62 (Iowa 1982), we held that judicial review was available under Iowa Code section 17A.19 over a local civil rights agency's decision even though the agency wasn't a "referral agency," and therefore, a right of review was not expressly conferred by section 216.19(7) (then section 601A.19). *Dietz* indicated that judicial review was authorized by the section's opening

paragraphs and supported by the provision directing a broad construction of the ICRA. *Id.*; *see also* Iowa Code § 216.18.

Petro argues by analogy that our recognition of an implied right of judicial review in *Dietz* should presage our recognition of a right to sue here. But judicial review is different from an independent right to sue. Serious questions would be raised if local agency determinations were unreviewable. Judicial review is a *restraint* on municipal authority; right-to-sue letters are an *expansion* of municipal authority. In the former case, the state courts exercise appellate review over the local agency; in the latter case, the local agency creates rights that it directs the state courts to enforce. Also, at a minimum, a local civil rights agency would be subject to certiorari review anyway even if section 17A.19 review were not available. *See Bricker v. Iowa Cty. Bd. of Supervisors*, 240 N.W.2d 686, 689 (Iowa 1976). Hence, *Molitor*, not *Dietz*, is the relevant precedent. *Molitor* requires express legislative authorization for district court jurisdiction—authorization that is lacking here. *See Molitor*, 360 N.W.2d at 568–69.

We also acknowledge that some states have recognized private actions under local civil rights ordinances. This is not because those states are more sympathetic to civil rights; it is traceable to differences in home rule authority in those jurisdictions. In *Sims v. Besaw's Café*, 997 P.2d 201, 210 (Or. Ct. App. 2000) (en banc), the Oregon Court of Appeals held that the City of Portland could adopt a civil rights ordinance allowing for private enforcement in the state courts. Oregon, however, does not appear to have the same limitation on home rule set forth in Iowa Code section 364.1. As the court explained,

> All that the Portland anti-discrimination ordinance does is change the substantive law that state courts use to perform the adjudicative role that they have been assigned by state law

> to perform.  It does not run afoul of any limit of which we are aware that is imposed on the enactment of municipal law.

*Id.* at 208 n.12.  The court also took the opposite view from that which we expressed in *Molitor*:  "Oregon Supreme Court cases establish, however, that, contrary to McQuillin's view, Oregon cities *can* "enlarge the common law . . . duty or liability of citizens among themselves."  *Id.* at 209.

In *Edwards Systems Technology v. Corbin*, 841 A.2d 845, 854–55 (Md. 2004), the Maryland Court of Appeals likewise held that an individual could sue in state court for violation of county antidiscrimination ordinances.  But there, in response to earlier decisions deeming such actions impermissible, the state legislature had adopted a law expressly providing that "a person who is subjected to an act of discrimination prohibited by the county code may bring and maintain a civil action against the person who committed the alleged discriminatory act for damages, injunctive relief, or other civil relief."  *Id.* at 853 (quoting Md. Code Art. 49B, § 42, since repealed and transferred by Acts 2009, ch. 120, § 1); *see also Bracker v. Cohen*, 612 N.Y.S.2d 113, 115 (App. Div. 1994) (finding that New York City could create a private cause of action for unlawful discrimination after determining that the state home rule law, "which lists the areas in which local governments may not legislate, [does not contain] any language relating to the creation of private causes of action").

On the other hand, in *State ex rel. Bolzenius v. Preisse*, 119 N.E.3d 358, 362 (Ohio 2018) (per curiam), the Ohio Supreme Court recently held that a proposed ordinance was beyond the power of the City of Columbus to enact because it would create a private cause of action.  The proposed ordinance would authorize " 'any resident of the City of Columbus' to 'enforce the rights and prohibitions of this Community Bill of Rights

through an action brought in any court possessing jurisdiction over activities occurring within the City.' " *Id.* The Ohio court explained that "the proposed ordinance here would create a new cause of action—something we have held municipalities lack the power to do." *Id.*; *see also Malicote v. Don Alberto Corp.*, No. 5:18-CV-29-KKC, 2018 WL 4760832, at *3 (W.D. Ky. Oct. 2, 2018) ("While the Kentucky General Assembly granted municipalities the authority to prohibit forms of discrimination by local ordinance, it did not allow municipalities to create private rights of action for those injured by violations of such ordinances."); Paul A. Diller, *The City and the Private Right of Action*, 64 Stan. L. Rev. 1109, 1129–33 (2012) (noting the different approaches taken by states as to municipal authority to create private rights of action).

Local civil rights enforcement by local agencies is an important component of civil rights enforcement in Iowa. In recent years, using their own enforcement authority, those agencies have been responsible for achieving significant legal outcomes. *See generally Seeberger v. Davenport Civil Rights Comm'n*, 923 N.W.2d 564 (Iowa 2019); *Simon Seeding & Sod, Inc. v. Dubuque Human Rights Comm'n*, 895 N.W.2d 446 (Iowa 2017); *Palmer Coll. of Chiropractic v. Davenport Civil Rights Comm'n*, 850 N.W.2d 326 (Iowa 2014).

Here the DCRC conducted a seemingly thorough investigation over a period of nearly three years that found probable cause to believe that civil rights violations had occurred. When conciliation was unsuccessful, the DCRC could have initiated proceedings as it did in two of the cases noted above. The record in this case does not reveal why the DCRC declined to go forward despite having the benefit of its own exhaustive investigation. Regardless, nothing in today's decision affects enforcement of the local civil rights ordinances by local civil rights agencies.

Instead, this case is one manifestation of a broader principle. Many times, while applying well-settled principles of statutory interpretation, we have held that the general assembly did not provide a private right of action as the remedy for a particular violation of law. *See, e.g., Estate of McFarlin v. State*, 881 N.W.2d 51, 58 (Iowa 2016); *Bass v. J.C. Penney Co.*, 880 N.W.2d 751, 763 (Iowa 2016); *Shumate v. Drake Univ.*, 846 N.W.2d 503, 516 (Iowa 2014); *Mueller v. Wellmark, Inc.*, 818 N.W.2d 244, 254–58 (Iowa 2012); *King v. State*, 818 N.W.2d 1, 34–35 (Iowa 2012).

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), is a seminal case in our nation's history, but it tends to be cited for things it did not hold. *Marbury* does *not* stand for the proposition that every wrong is remediable by a private action in court. In fact, Marbury *lost* his case, despite having suffered a legal wrong, because the Supreme Court held it could not constitutionally exercise jurisdiction. *Id.* at 173–80. So too here: We conclude the general assembly did not confer jurisdiction on our state courts to hear claims by private parties arising under municipal civil rights ordinances.

**IV. Summary Judgment on Claims Under the ICRA Based Upon Duplicative Filing.**

We now turn to whether Petro may pursue claims under the ICRA. Iowa Code section 216.19(6) states, "[A] complainant who files a complaint with [the ICRC] shall be prohibited from filing a complaint with the referral agency alleging violations based upon the same acts or practices cited in the original complaint."

Petro filed a complaint with the ICRC in April 2014. This complaint was administratively closed in September 2014. The following month, Petro filed a complaint with the DCRC that was cross-filed with the ICRC. Petro does not dispute for purposes of appeal that the disability,

harassment, and retaliation allegations he brought in April 2014 and those he brought in October 2014 are duplicative. His argument, rather, is that a memorandum authored by an ICRC civil rights specialist determined that Petro's second complaint was *not* duplicative. Based on that memorandum, the ICRC refused Palmer's request to close the second complaint. Later the ICRC issued a right-to-sue letter in January 2018. Petro argues that these actions remained binding unless overturned by judicial review and could not be reconsidered by the district court in this action.

We disagree. One problem with Petro's argument is that Palmer, as a protective measure, did seek judicial review of the January 2018 right-to-sue letter under the IAPA. In that judicial review proceeding, the district court found that the memorandum was "intermediate agency action and not final agency action," that the final ICRC action was the issuance of the right-to-sue letter, but that Palmer's Iowa Code section 216.19(6) arguments could and should be considered in Petro's district court action rather than in the judicial review proceeding. *See Ritz v. Wapello Cty. Bd. of Supervisors,* 595 N.W.2d 786, 792 (Iowa 1999) (holding that the district court could consider whether the plaintiff had timely filed her complaint with the ICRC, even though the plaintiff later obtained a right-to-sue letter from the ICRC and the defendant did not seek judicial review of the ICRC's issuance of that letter). Neither party sought further appellate review of the IAPA court's determination.

We set aside the question of whether the IAPA court's determination that Palmer is free to raise Iowa Code section 216.19(6) in this action has preclusive effect. In any event, we agree with the IAPA court's reasoning. By obtaining an administrative release and a right-to-sue letter, Petro prevented the ICRC from taking any further administrative action. *See*

Iowa Code § 216.16(4).  Once Petro received his right-to-sue letter, the ICRC lost jurisdliction of the matter.  *Id.*  Thus, Palmer was not precluded from raising in this action the question of whether Petro's second complaint was barred as duplicative of his prior complaint.  *See Ritz,* 595 N.W.2d at 792.  This forum was the proper one in which to resolve the section 216.19(6) issue.[2]

## V. Summary Judgment on Contract Claims Arising Out of Alleged Civil Rights Violations.

Petro argues that Palmer breached a contract when it discriminated against him on the basis of age and disability.  Petro contends that existing legal prohibitions on discrimination were incorporated into contracts he had with Palmer.  He relies on two specific examples of statements: (1) in the online application form and (2) in the equal opportunity policy referenced by Palmer's student handbook.

We agree with Palmer and the district court that the general statements of nondiscrimination in the online application and the equal opportunity policy quoted earlier do not give rise to contractual liability. The "notice" in the application form is akin to a poster on the wall announcing compliance with law.  It is what it says it is—a notice, and not a contractual covenant.  Although we have not addressed this issue in Iowa, courts have consistently found that such general statements of compliance are not tantamount to a binding contract.  *See, e.g., Bailey v. N.Y. Law Sch.,* No. 16 Civ. 4283 (ER), 2017 WL 6611582, at *9 (S.D.N.Y. Dec. 27, 2017) ("NYLS's statement of commitment to complying with non-discrimination laws . . . is a non-actionable general policy statement.");

---

[2]We are not asked to decide, and do not decide, whether Iowa section 216.19(6) should bar Petro's October 2014 complaint *to the DCRC* in addition to that same complaint as cross-filed with the ICRC.

*Spychalsky v. Sullivan*, No. CV010958DRHETB, 2003 WL 22071602, at *14 (E.D.N.Y. Aug. 29, 2003) (holding that a disabled student alleging discrimination did not have a viable claim against the law school for breach of "the promise in its admissions materials and handbooks regarding compliance with 'all federal, state and local laws' "), *aff'd*, 96 F. App'x 790 (2d Cir. 2004); *Harris v. Adler Sch. of Prof'l Psychology*, 723 N.E.2d 717, 722 (Ill. App. Ct. 1999) ("The Adler School's nondiscrimination policy was a statement of adherence to existing law and did not constitute, and was not, an independent contractual obligation.").

Petro directs our attention to *Harvey v. Palmer College of Chiropractic*, 363 N.W.2d 443, 445–56 (Iowa Ct. App. 1984).  In that case our court of appeals found that an expelled student raised a potentially viable claim against Palmer for breach of contract.  *Id.*  The student presented evidence that Palmer had failed to substantially comply with procedures set forth in the student handbook and the student council constitution and by-laws.  *Id.* at 445.

But Petro is not claiming here that Palmer failed to follow its processes and procedures.  Notably, the specific equal opportunity statement on which Petro relies was accompanied by information on Palmer's procedures.  These procedures included instructions on "filing a report of discrimination/harassment" with specific contact persons identified and links to other procedures, as well as a link to an "equal opportunity complaint form."  Petro does not allege that he pursued any of these avenues for relief or that Palmer failed to comply with them.

A party cannot pluck a single statement out of context and feather it into a contract.  If the student handbook amounts to a binding contract, an issue we do not decide today, at most Palmer's contractual commitment in the area of nondiscrimination was to follow the identified processes and

procedures for addressing discrimination complaints. *See Nungesser v. Columbia Univ.*, 244 F. Supp. 3d 345, 373–74 (S.D.N.Y. 2017) (dismissing a student's breach of contract claim based on gender-based misconduct where the student did not utilize the available mechanisms for seeking redress). As the district court noted, "Petro's claim is entirely predicated not on a separate cause of action for breach of established rules and procedures for student grievance, but on the substantive discrimination and retaliation against him." Summary judgment was properly granted on this issue.

## VI. Conclusion.

For the foregoing reasons, we affirm the judgment of the district court.

**AFFIRMED.**

All justices concur except Appel, J., who concurs in part and dissents in part, and Waterman, J., who takes no part.

#18–2201, *Petro v. Palmer Coll. of Chiropractic*

**APPEL, Justice (concurring in part and dissenting in part).**

I respectfully dissent on division III of the majority opinion. Here, the majority rewrites the Iowa Civil Rights Act (ICRA) to deprive local civil rights commissions of the same remedial powers held by the Iowa Civil Rights Commission (ICRC) by prohibiting local civil rights commissions of the power to issue to complainants a right-to-sue letter. Such letters permit victims of discrimination to sue in state court to enforce local civil rights ordinances. The majority adopts a tight-fisted, highly restrictive approach to remedies for civil rights violations, but in my view, it does not reflect the best reading of the language of the ICRA or further the important underlying purpose of providing effective remedies for civil rights violations.

First, the ICRA provides that local commissions should have "the same rights and remedies as provided in this chapter." Iowa Code § 216.19(4) (2017). "This chapter," Iowa Code chapter 216, provides that a party may obtain the remedy of an administrative release and launch an action in district court. *Id.* § 216.16. Yet, the majority interprets the ability of a complainant to obtain an administrative release and right-to-sue letter under the ICRA as eliminated for local civil rights commissions under local civil rights ordinances.

Second, the legislature anticipated such judicial gymnastics could occur in the guise of statutory interpretation to narrow the remedies available under local civil rights ordinances. After all, although Iowa courts have often been remarkably advanced in the protection of civil rights, there have also been occasions where civil rights statutes have been narrowly construed to defeat their underlying purpose. *See Coger v. Nw. Union Packet Co.,* 37 Iowa 145, 159–60 (1873) (ruling that segregated

dining practices in public accommodations are unreasonable and unenforceable); *Clark v. Bd. of Dirs.*, 24 Iowa 266, 277 (1868) (finding that people of color cannot be denied access to public education or relegated to segregated schools). *But see Brown v. J.H. Bell Co.*, 146 Iowa 89, 95, 101–02, 123 N.W. 231, 233, 236 (1909) (construing rental space at a food fair where coffee was served to patrons was not a location "where refreshments [were] served" under an early Iowa civil rights statute dealing with public accommodations). In order to prevent a narrow interpretation in the context of remedies available under local civil rights ordinances, the legislature expressly provided that

> [n]othing in this chapter shall be construed as indicating any of the following:
>
> . . . An intent to prohibit an agency or commission of local government . . . from developing procedures and remedies necessary to insure the protection of rights secured by this chapter.

Iowa Code § 216.19(1).

So, local commissions are to provide "the same rights and remedies" as the ICRC and "nothing" in the chapter shall be construed as indicating an intent to prohibit an agency or commission of local government from developing procedures to insure the protection of rights. Yet, that is exactly what the majority does. The majority uses analysis of the statute "as a whole" to prohibit a local civil rights ordinance from providing the "same rights and remedies" as those afforded the ICRC. That is not permitted by Iowa Code section 216.19(1).

Third, there is yet another statutory provision that the legislature included in the ICRA to prevent the interpretation by the majority. To the extent there is ambiguity in the above provisions of the ICRA, Iowa Code section 216.18(1) provides that they are to be "construed broadly to

effectuate its purposes." *Id.* § 216.18(1). The purpose of the ICRA is to provide robust remedies for violations of the antidiscrimination laws and ordinances. Is there anyone who, after reading the opinion in this case, thinks the majority has construed the statute "broadly to effectuate its purposes"?

In addition, the majority does not consider the larger history of the development of civil rights statutes and their remedial provisions. As will be shown below, the right to sue is an important aspect of civil rights enforcement. It is not some kind of accidental provision or outmoded relic that can be regarded as an inconsequential statutory appendix. A review of the history of the development of civil rights statutes reinforces my view that proper interpretation of the ICRA provides for robust remedies for state and local civil rights commissions, which includes a right to sue in district court.

Finally, the majority relies on a conclusory federal district court authority in the interpretation of the distinctive provisions of the ICRA. The federal district court, like the majority, engages in a trifecta of error by ignoring the "same rights and remedies" language of Iowa Code section 216.19(4), the "nothing shall be construed" language of Iowa Code section 216.19(1), and the "construed broadly" language of Iowa Code section 216.18. And the federal court makes no effort to understand the function of a right to sue in civil rights law, both generally and under the ICRA in particular. The majority of this court is once again influenced by a flawed, federal rights-restricting precedent that should have no persuasive power on a state court.

**I.    Overview of the Problem of Remedies in Civil Rights Enforcement.**

**A. Introduction.** The battle over enforcement of civil rights after the civil war has always included a fight over remedies. *See Pippen v. State,* 854 N.W.2d 1, 8–19 (Iowa 2014). Early civil rights acts were enacted in a number of states, including Iowa, but enforcement mechanisms proved ineffective. *See* Robert E. Goostree, *The Iowa Civil Rights Statute: A Problem of Enforcement,* 37 Iowa L. Rev. 242, 242–44 (1951) (noting difficulties in enforcing criminal provision of Iowa's historic civil rights statutes).

It is important to recognize that questions regarding the scope of available remedies are not mere afterthoughts secondary to substantive statutory considerations. As Justice Harlan trenchantly declared many years ago, there is a 1:1 relationship between the substance of a right and the available remedy. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 400 n.3, 91 S. Ct. 1999, 2007 n.3 (1971) (Harlan, J., concurring in the judgment). When a remedy is judicially diminished, the substance of the statutory or constitutional right is also reduced. *See Baldwin v. City of Estherville*, 915 N.W.2d 259, 284 (Iowa 2018) (Appel, J., dissenting).

**B. The Problem of Remedies in Federal Civil Rights Enforcement.**

1. *Lack of remedies: the fair employment practices committee.* During World War II, President Roosevelt issued executive orders establishing a Fair Employment Practices Committee (FEPC) to receive and investigate complaints of discrimination in connection with entities contracting with the government. *See generally* Arthur Earl Bonfield, *The Origin and Development of American Fair Employment Legislation,* 52 Iowa

L. Rev. 1043, 1062–63 (1967). The FERC, however, had no enforcement mechanism. *Id.* at 1063–64. Although many cases before the FEPC were ultimately adjudicated, without reliable and clearly defined enforcement powers, the policy of nondiscrimination, according to Professor Bonfield, became "ineffective." *Id.* at 1067. Although other attempts to advance civil rights without enforcement mechanisms were attempted prior to 1963, "[a] consensus [emerged] that the FEPC approach [was] incapable of coping with the complex problems of employment discrimination." Robert Belton, *Comparative Review of Public and Private Enforcement of Title VII of the Civil Rights Act of 1964*, 31 Vand. L. Rev. 905, 910 (1978).

2. *Dual remedies under the Civil Rights Act of 1964.* When Congress considered its groundbreaking Civil Rights Act of 1964, it confronted the question of how the legislation would be enforced. The original version of the bill contained a strong administrative agency along the model of the National Labor Relations Board (NLRB). *See* Steven B. Burbank et al., *Private Enforcement*, 17 Lewis & Clark L. Rev. 637, 691–96 (2014) [hereinafter Burbank et al., *Private Enforcement*]. Members of Congress, particularly those from Southern states, feared creation of a state agency with strong enforcement powers. *Id.* at 691–92. And others believed that the statute should rely primarily on private enforcement. *Id.* at 692.

Initially, in what was seen as a defeat for the civil rights community, Congress created an Equal Employment Opportunity Commission (EEOC) with very limited investigatory power and no enforcement power, instead leaving enforcement to private litigation. *Id.* at 688–92. It did provide, however, that a complainant could file a complaint with the EEOC and, after satisfying certain procedural requirements, could obtain an administrative release and file a direct action in federal court. *Id.* at 688–89. Over time, Congress expanded the powers of the EEOC to include the

ability to bring certain administrative actions, while the provisions related to private actions remained intact. *Id.* at 697.

There can be little doubt that Congress regarded direct private actions as a central component in an effective approach to enforcement of the Civil Rights Act. As the Supreme Court noted in *Alexander v. Gardner-Denver Co.*, the private litigant is "an essential means of obtaining judicial enforcement of Title VII." 415 U.S. 36, 45, 94 S. Ct. 1011, 1018 (1974). According to a Senate Report, the provisions of the Civil Rights Act of 1964 "depend heavily upon private enforcement." S. Rep. No. 94-1011, at 1 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 5908, 5910. Further, when a private litigant brings an action pursuant to Title VII, "the private litigant not only redresses his own injury but also vindicates the important . . . policy against discriminatory employment practices." *Alexander*, 415 U.S. at 45, 94 S. Ct. at 1108. As noted by Justice Ginsburg, "[C]ivil rights statutes vindicate public policies 'of the highest priority,' yet 'depend heavily upon private enforcement.' Persons who bring meritorious civil rights claims, in this light, serve as 'private attorneys general.' " *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 635–36, 121 S. Ct. 1835, 1857 (2001) (Ginsburg, J., dissenting) (quoting S. Rep. No. 94-1011, at 2, 3, 5, *as reprinted in* 1976 U.S.C.C.A.N. at 5910, 5912). Private enforcement of the Civil Rights Act of 1964 was not an afterthought or a mere appendage mysteriously latched onto the statute in some obscure subcommittee. It was an essential part of the remedial scheme. *See* George Rutherglen, *Private Rights and Private Actions: The Legacy of Civil Rights in the Enforcement of Title VII*, 95 B.U. L. Rev. 733, 757 (2015) (finding that private actions play crucial role in enforcement of Title VII).

Scholars have explored the potential advantages of private enforcement. Among other things, private enforcement tends to multiply resources devoted to enforcement actions, shift costs of regulation off of government budgets, encourages legal and policy innovation, promotes efficient detection, provides insurance against the risk that a system of administrative implementation will be subverted, and limits the need for visible intervention by a bureaucracy in the economy and society. Burbank et al., *Private Enforcement,* 17 Lewis & Clark L. Rev. at 662.

**C. Evolution of Iowa Law Leading to Adoption of Dual Remedies Under the Iowa Civil Rights Act.** Although Iowa enacted a limited civil rights statute prohibiting discrimination in certain public accommodations in 1884, the statute provided only a criminal remedy which required a prosecution by a district attorney. *See* Robert Benjamin Stone, *The Legislative Struggle for Civil Rights in Iowa, 1947–1965,* 18–19 (1990) (M.A. Thesis on file with Theses and Dissertations at Iowa State University Digital Repository) [hereinafter Stone, *Civil Rights in Iowa*]. Most district attorneys were reluctant to bring such charges. *Id.* Further, convictions were difficult to obtain from Iowa juries. Out of twenty-two criminal prosecutions brought under the Iowa Civil Rights Act of 1884 against eleven defendants in the 1939 to June 1950 period, only four convictions were secured. *Id.* at 20–21; *see also* John Charles Lufkin, *The Founding and Early Years of the National Association for the Advancement of Colored People in Des Moines, 1915–1930*, 45 Annals of Iowa 439, 456–57 (1980).

In the post-WWII period, proposals surfaced for enactment of a fair employment practices act in Iowa. After more than a decade of advocacy, the Iowa General Assembly enacted such a measure in 1963. 1963 Iowa Acts ch. 330 (codified at Iowa Code ch. 735 (1966)). The measure, as

proposed over the years, was originally relatively robust. *See* Stone, *Civil Rights in Iowa* at 88–93. The measure ultimately enacted by the legislature was, however, watered down and the resultant law declared that discrimination in employment was illegal but did not create a separate government commission with enforcement powers. *Id.* Rather, enforcement was provided for only through criminal actions brought by a county attorney, which is in essence the same remedial scheme under the Iowa Civil Rights Act of 1884 that had proved ineffectual. *Id.* The measure prohibited discrimination in employment, but the enforcement mechanisms were restricted to criminal actions brought by a county attorney. *Id.*

In 1965, however, the Iowa legislature enacted a more robust civil rights statute. 1965 Iowa Acts ch. 21 (codified at Iowa Code ch. 105A (1966)). In a seminal piece in the Iowa Law Review, former ICRC Chair Merle Fleming explored the addition of the remedy of a private cause of action to the ICRA. *See* Merle Wilna Fleming, *Implications of the Right-to-Sue Amendment to Iowa's Civil Rights Law*, 65 Iowa L. Rev. 720, 738–46 (1980) [hereinafter Fleming, *Right to Sue*]. Fleming recognized the benefit of administrative remedies. She noted that a complainant in an administrative enforcement context obtained the benefit of the expertise of the commission in the investigation and enforcement of the claim. *Id.* at 744. Further, Fleming noted that the administrative process is also likely to be less costly for the complainant. *Id.* at 745.

At first, the ICRA did not follow the dual remedy approach of federal law and only provided for administrative remedies by the ICRC. *Id.* at 755–56. If the legislature expected that the agency would develop a strong enforcement profile adequate to address the problem of discrimination, those expectations were not met. By the late 1970s, dissatisfaction with

the performance of the ICRC led to an amendment to the ICRA that provided a complainant could obtain an administrative release and to bring a direct action in district court. *Id.* at 760–61.

Yet, Fleming maintained there were downsides to reliance on administrative enforcement. She noted that the resources available to the agency may be limited. Indeed, as was noted in a case decided by this court shortly after the legislature provided for private enforcement of the ICRA, it had long been assumed that the agency would be selective and concentrate its energy and resources on those cases to which it assigns a high priority. *See Estabrook v. Iowa Civil Rights Comm'n*, 283 N.W.2d 306, 311 (Iowa 1979) (en banc). As a result, the agency may assign a low priority to a meritorious case.

Even for meritorious cases, inordinate delay may be part of the bureaucratic landscape. As noted by Fleming, in the struggle for adequate funding, the agency must gain sufficient political support in the battle for the marginal public dollar. According to Fleming, "The institutional goals and maneuvers to elicit support may or may not be in conflict with the Commission's purpose of eradicating discriminatory behavior." Fleming, *Right to Sue*, 65 Iowa L. Rev. at 726. In other words, the need for political support may directly or indirectly impact the operations of the agency.

As an alternative to administrative action, a complainant may now request from the ICRC an administrative release and obtain a right-to-sue letter. *See* Iowa Code § 216.16 (2017). By obtaining the administrative release and right-to-sue letter, the complainant in effect, bypasses the commission process and obtains the right to directly file an action in district court alleging violation of the ICRA. There is no prior final agency determination, however, and the district court proceeding is de novo. With

a right-to-sue letter, the complainant controls the enforcement of the claim but ordinarily must hire a lawyer to represent them in the litigation.

There are a number of distinct advantages to obtaining an administrative release and right-to-sue letter. As noted by Fleming, "characteristics of administrative agencies that interfere with achieving the agency purpose emerged almost immediately after the [ICRC] began to function." Fleming, *Right to Sue*, 65 Iowa L. Rev. at 726. Fleming further observed that the agency depends upon support from the executive and legislative branches and others while at the same time is vulnerable to attack from groups opposing regulation. *Id.* Fleming noted that commission members may be engaged in "protracted controversies [that] obscure the purpose of the agency, damage its credibility, and lead to the loss of staff members and reduction in the productivity of the agency." *Id.* at 727. Historically, "[t]he combination of expanded jurisdiction, low budgets, and administrative and staffing difficulties produced a large [agency] backlog . . . ." *Id.* (footnote omitted).

According to Fleming, by adopting the provisions relating to administrative release, "the vigor with which the fact finding is pursued and the speed with which it proceeds will depend mainly on the plaintiff and his or her counsel," which in some cases may well be seen as a distinct advantage. *Id.* at 739. The role played by the option of a direct right of action was echoed by Professor Arthur Bonfield, who noted that a private right of action "could ensure the vindication of the injured party's rights where the administrative agency charged was unable or unwilling to act on the merits of an alleged violation of the Act." Arthur Earl Bonfield, Allan Vestal Distinguished Chair, Univ. of Iowa Law Sch., Address at State Historical Building, *The Origin and Rationale of the Iowa Civil Rights Act* 14 (May 20, 2015).

This case, with its lengthy delay in processing and ultimate failure of the local commission to pursue the matter, suggests that the observations of Fleming and Bonfield regarding the advantages of a direct action option for complainants apply to the operations of local commissions today as much as to the ICRC in the late 1960s. While the ICRC and local commissions have greater statutory enforcement powers than the original EEOC and have generally proven more capable in resolving complaints, the ability to obtain an administrative release and the right to sue remain an important backstop for when the administrative process breaks down or when private counsel has the ability to more aggressively pursue a claim through litigation than a slower paced and less intense administrative process.

**D. Role of Private Enforcement in American Legal Tradition.** Private enforcement of public policy, which is central to the Federal Civil Rights Act of 1964 and ICRA, is consistent with American legal tradition. Unlike Europe, where regulation is ordinarily accomplished by government bureaucracies, we have tended to rely more on private common law style litigation to achieve regulatory goals. *See* J. Maria Glover, *The Structural Role of Private Enforcement Mechanisms in Public Law*, 53 Wm. & Mary L. Rev. 1137, 1146–55 (2012) [hereinafter Glover, *Private Enforcement*].

In the American legal tradition, private enforcement of statutory law is a public good. As noted by the United States Supreme Court,

> [A] civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms. . . . [A] successful civil rights plaintiff often secures important social benefits that are not reflected in nominal or relatively small damages awards.

*City of Riverside v. Rivera*, 477 U.S. 561, 574, 106 S. Ct. 2686, 2694 (1986) (citations omitted).

And, of course, for the harmed individual, the availability of judicial process is important to ensure an avenue for vindication of public rights. The notion that a harm deserves a remedy is as old as the nation. All lawyers and many citizens are familiar with the stirring words of *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), where Chief Justice John Marshall declared that "[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Id.* at 163. And that is exactly what private litigation under the ICRA provides.

Further, private litigation has a different substantive character than actions brought by government bureaucracies. Not only are government bureaucracies capable of bringing only a small number of claims due to limited resources, the claims the government does bring tend to be small, easy, and uncontroversial cases. *See* Michael Selmi, *Public vs. Private Enforcement of Civil Rights: The Case of Housing and Employment*, 45 UCLA L. Rev. 1401, 1438–39 (1998).

With respect to the ICRA, private enforcement is a consequence of "deliberate statutory design" and is "integral to our larger system of public regulation." Glover, *Private Enforcement*, 53 Wm. & Mary L. Rev. at 1146, 1176. Private actions are an important part of the regulatory scheme in light of the limitations of public bureaucracies, including perennial lack of resources, the inherent limitations of a government bureaucracy, the risk of lax bureaucratic enforcement, and, as public choice scholars have noted, the risk of regulatory capture. *Id.* at 1153–60. The ICRA is no exception. The availability of an administrative release and a right to sue is not a supplementary add-on, but is an indispensable part of the institutional enforcement architecture under the ICRA.

The majority emphasizes that only a few right-to-sue letters have been obtained in several recent years from three local civil rights commissions. First, the data presented provides an incomplete picture. The majority cites to the Davenport Civil Rights Commission's (DCRC's) most recent annual reports, asserting that it "has issued only one or two right-to-sue letters a year, representing approximately 1% or, at most, 1.5% of its caseload." *See* Davenport Civil Rights Comm'n, 2017 Annual Report 22, 2016 Annual Report 16, https://cityofdavenportiowa.com/ cms/one.aspx?portalId=6481456&pageId=10025497. This same report cited by the majority, however, shows that the right-to-sue letter comprised one of five of its probable-cause resolutions in 2017.

Further, some commissions break down how probable-cause cases were concluded (such as issuance of a right-to-sue letter, among other results), and others do not. By way of example, the Des Moines Civil and Human Rights Commission 2019 annual report states that eighteen of their adjudications were probable-cause resolutions but does not break those number down further. *See* Des Moines Civil & Human Rights Comm'n, Annual Report 2019 8, https://www.dsm.city/departments/ civil_and_human_rights/forms_and_documents.php#outer-594.

And in other municipalities that do break out right to sue as a separate category, usage may be more widespread than the municipalities highlighted in the majority opinion. For example, in Dubuque in 2017, right-to-sue letters were obtained in 11% of the cases. *See* Dubuque Human Rights Dep't, Annual Report—Fiscal Year 2017 13, https://cityofdubuque.org/DocumentCenter/View/35323.

More to the point, alternative dispute resolution determinations— such as mediation settlement, outside settlement, or conciliation settlement, which may or may not be reflected in annual report numbers

since they may be categorized as withdrawals, transfers, or satisfactory resolutions—may also be a result of the mere possibility of a right-to-sue letter arising from a probable-cause determination. During the investigatory process, it may also become clear to the offending party that their position is much weaker than they initially perceived, and they may take lengths to avoid the lawsuit. We know this from our own court statistics too, since most cases end in settlement, even of those going to trial. *See* John Barkai et al., *A Profile of Settlement*, 42 Ct. Rev.: J. of Am. Judges Ass'n 22, 34 (2006) (finding that roughly ninety-seven percent of civil cases settle). But this limited data does not mean that the right to sue is unimportant for local civil rights commissions and complainants.

Second, even assuming that there were a couple of cases from each local civil rights commission where a right-to-sue letter was desired, there would be dozens of cases in recent years across the state that could not be brought under the majority approach. Third, while the number of right-to-sue letters sought from local civil rights commissions may be relatively low in percentage terms, the potential of claims where a right-to-sue letter has been sought is likely higher than in most cases, as an attorney has ordinarily evaluated the case and determined to bring a court action notwithstanding the difficulty of prevailing in civil rights cases generally. The cases where a claimant seeks an administrative release and right-to-sue letter are, therefore, not a very good place to winnow claims based upon an absolute prohibition. Fourth, the need for an alternate remedy in the event of a bureaucratic dead end, like that suggested by Fleming and experienced by Petro, remains an important escape valve. Finally, the presence of a right-to-sue remedy has an important impact on the mediation and conciliation process. All parties should know that if

mediation or conciliation before a local civil rights commission is unsuccessful, a complainant has a right to have their day in court.

Finally, the issue before the court is whether the right to sue is available in proceedings before local commissions, not whether and to what extent it has been utilized previously. The point of the right-to-sue letter issuance is to provide an alternate remedy for individuals because of the capacity limitations of local commissions and also because it is the complainant's choice. Further, the framework provides for the right to sue as a backstop for cases just like Petro's, where the local commission proves to be a bottleneck and prevents a complainant from obtaining a remedy for a potentially meritorious claim.

**E. Summary.** There is no question that both administrative and private avenues of enforcement are available for claims brought under the ICRA. And, there is no doubt that the private remedy is an important part of the remedial scheme and is designed not merely to vindicate private rights but to promote the public interest in civil rights enforcement. But, in this case, there is a question of whether the second path—the crucial remedy of obtaining an administrative release and proceeding with a direct action in district court—is available to a complainant who has brought a claim under a local civil rights ordinance.

**II. Proper Interpretation of Distinctive Provisions of the Iowa Civil Rights Act.**

Iowa Code section 216.19(1) provides that "[a]ll cities shall, to the extent possible, protect the rights of the citizens of this state secured by the Iowa civil rights Act." Although this section does not answer our specific question about the power of a local commission, it plainly suggests that the legislature does not want a cramped interpretation of local power to protect civil rights.

There is, however, more specific language dealing with the question of the scope of remedies available under local civil rights ordinances. Iowa Code section 219.19(4) provides,

> The Iowa civil rights commission may designate an unfunded local agency or commission as a referral agency. A local agency or commission shall not be designated a referral agency unless the ordinance creating it provides *the same rights and remedies as are provided in this chapter.* The Iowa civil rights commission shall establish by rules the procedures for designating a referral agency and the qualifications to be met by a referral agency.

(Emphasis added.) The statute *requires* that the local civil rights ordinances of referral agencies like the DCRC provide "the same rights and remedies," or in other words, rights and remedies that are parallel to those provided in the ICRC. *Id.* The ICRA provides that ICRC complainants may obtain an administrative release and a right-to-sue letter. *Id.* § 216.16. As a result, Iowa Code section 219.19(4) requires that local referral agencies like the DCRC must have the authority to provide claimants the alternate remedy of an administrative release with the concomitant right to sue in district court.

The rules promulgated by the ICRC as required by Iowa Code section 219.19(4) declare that, with respect to local referral agencies, "[t]he ordinance or enabling legislation under which the agency is established *must provide at a minimum the same rights and remedies to discrimination available under the Act.*" Iowa Admin. Code r. 161—1.6(3)(*a*)(2). The rule is unqualified. It does not selectively tiptoe through the statutory tulips to arrive at a narrow formulation of available remedies from local commissions. The rules have been in place in some form since 1975, with no legislative action to disturb them. Over time, the agency has found the approach in the rules satisfactory and the legislature has not objected. *See City of Sioux City v. Iowa Dep't of Revenue & Fin.*, 666 N.W.2d 587,

592 (Iowa 2003) ("We consider the legislature's inaction as tacit approval of the department's action.").

Further, local civil rights ordinances authorizing administrative release and right to sue have been part of Iowa's legal landscape for decades. Such a remedy is expressly provided in local civil rights ordinances not only in Davenport, but also in Cedar Rapids, Des Moines, Fort Dodge, Iowa City, Marion, and Sioux City. *See* Cedar Rapids, Iowa, Municipal Code § 69.15 (2020); Des Moines, Iowa, Municipal Code § 62-16; Fort Dodge, Iowa, Municipal Code § 2.16.180 (2020); Iowa City, Iowa, Code § 2-4-10 (2019); Marion, Iowa, Code of Ordinances § 31.17 (2019); Sioux City, Iowa, Municipal Code § 4.04.290 (2020). In addition, the remedy of administrative relief and right to sue is part of other local civil rights ordinances as a result of wholesale incorporation of Iowa Code section 216. *See* Clinton, Iowa, Code of Ordinances § 32.136 (2020); Mason City, Iowa, City Code § 2-10-2 (2019). The landscape for such remedies seemed relatively well settled as a matter of law by Iowa Code section 216.19(4) and as a matter of practice by the cited ordinances until the boiling boulders of the majority surfaced today.

The question in this case boils down to this: is an administrative release with the related right to sue in district court established in Iowa Code section 216.16 a part of "the same rights and remedies . . . provided in this chapter" that local commissions must embrace under Iowa Code section 216.19(4)? It is hard to argue that it is not. Certainly Iowa Code chapter 216.16 creates a "right or remedy," namely, the right to obtain a right-to-sue letter and to file a claim in district court. Indeed, Iowa Code section 216.16(3)(*a*) notes that when the commission grants the complainant a release, the release should state that "the complainant has a *right to commence an action in the district court.*" (Emphasis added.) The

statutory notices required by the ICRA thus expressly recognize that the ability to obtain an administrative release and right-to-sue letter involves "a right" to commence an action in district court. The notices issued by the ICRC and the DCRC in this case refer to the "right to commence an action" in state court. *Id.* The majority does not and cannot claim that the ability to obtain an administrative release and subsequent right to sue in district court is not a "right or remedy" under the ICRA. Any other result would be contrary to the statutory command and would not allow cities to protect the rights of citizens of the state "to the extent possible." *Id.* § 216.19(1).

The Houdini majority attempts to escape the "same rights and remedies" language through analysis of statutory terms that do not directly relate to whether a complainant may obtain an administrative release and right-to-sue letter from a local civil rights commission. But the ICRA declares that "nothing" in the Act can be construed to prohibit local civil rights commissions from developing "procedures and remedies necessary" to implement the Act. *Id.* § 216.19(1)(*b*). My view is "nothing" means "nothing." But the majority thinks it may apply rules of construction to escape the "nothing" provision. I don't see how. In my view, the majority's reasoning is exactly what the legislature sought to prevent in Iowa Code section 216.19(1).

Further, a narrow interpretation would be contrary to Iowa Code section 216.18(1) which provides that the chapter shall be "construed broadly to effectuate its purposes." The majority finds the terms of the statute vague and less than clear, even though the legislature had directly and clearly stated that when faced with interpretive choices, the statute should be "construed broadly to effectuate [the Act's] purposes."

In *Pippen,* we observed that "[i]n making choices under the Iowa Civil Rights Act, we must be mindful of the legislative direction that the Act be broadly interpreted to effectuate its purposes." 854 N.W.2d. at 30. Cases from other jurisdictions have emphasized that similar statutory language in state civil rights acts requires the "widest constitutional application" of the statute. *Id.* (quoting *Fair Emp't Practices Comm'n v. Rush-Presbyterian-St. Luke's Med. Ctr.,* 354 N.E.2d 596, 600 (Ill. App. Ct. 1976)); *see also Wondzell v. Alaska Wood Prod., Inc.,* 601 P.2d 584, 585 (Alaska 1979) (finding Alaska's civil rights statute evinced the "legislature's intent 'to put as many "teeth" into the statute as possible' " (quoting *McLean v. State,* 583 P.2d 867, 869 (Alaska 1978))). But this broad, widest constitutional application, as-many-teeth-as-possible approach to the ICRA is something that the majority steadfastly refuses to apply.

Further, as the history of the development of remedies to civil rights statutes demonstrates, the availability of a private enforcement mechanism can be extremely important. Without it, a local ordinance would provide a second-class remedial scheme, a result the legislature expressly sought to avoid. But the legislature plainly intended local civil rights ordinances to provide local commissions with the same set of remedies that are available to the ICRC.

The majority also suggests that because local ordinances may include substantive protections beyond that in the ICRA, as expressly permitted by the ICRA in Iowa Code section 216.19(1)(*c*), allowing a person seeking to enforce such expanded protection would allow for "greater rights and remedies" than allowed under the ICRA. But such an interpretation would undercut enforcement of local civil rights ordinances.

There is nothing in the statute that suggests an intent to limit such rights and remedies available under local civil rights ordinances. Our

recent caselaw recognizes this. *See Simon Seeding & Sod, Inc. v. Dubuque Human Rights Comm'n*, 895 N.W.2d 446, 474 (Iowa 2017) (Appel, J., concurring) ("[T]he Iowa legislature has directed us to broadly construe the Iowa Civil Rights Act to accomplish its remedial purposes. The majority opinion is consistent with that legislative direction." (Citation omitted.)). Further, under the majority's "greater rights and remedies" interpretation, a two-tier enforcement system for local ordinances would be established. A local ordinance could permit administrative releases and right-to-sue letters for complainants who raise discrimination claims protected under the ICRA, but not for substantive discrimination claims protected by local ordinances but not the ICRA. That makes no sense. In context, a permissible interpretation, and a better interpretation in light of the command to construe the terms of the ICRA broadly, is to read the "same rights and remedies" language in Iowa Code section 216.19(4) as applicable to all substantive protections in local ordinances. In other words, under local ordinances, all affected persons have a right to file a complaint with the local commission and a right to an administrative release and right-to-sue letter after filing such a complaint. That is the approach taken by the city solons in Davenport, Cedar Rapids, Des Moines, Fort Dodge, Iowa City, Marion, and Sioux City. We should make the same call here today.

The notion that a local civil rights ordinance has the same remedies as those available under the ICRA makes structural sense as well. The creation of local civil rights commissions was designed to enhance and extend the mechanisms of enforcement of civil rights. Denying local agencies the ability to issue right-to-sue letters would significantly undercut the value of local civil rights agencies to complainants who would assume the risk of undue administrative delay, lack of local commission

resources, and unwillingness of local commissions to prosecute complaints.

Indeed, in this case, it took the staff of the DCRC almost three years to issue its probable-cause findings. And, although probable cause was found, the DCRC refused to advance the matter to hearing. This case is an exemplar of why a private right of action is an important part of civil rights law.

Finally, there is nothing in the federal district court case of *Toppert v. Northwest Mechanical, Inc.*, 968 F.Supp 2d 1001 (S.D. Iowa 2013), to persuade me to the contrary. *Toppert* has the same trifecta of errors which the majority incorporates in its opinion. First, *Toppert* does not even consider the "same rights and remedies" language of Iowa Code section 216.19(4) and its implementing administrative rule. Second, *Toppert* does not even apply the rule of construction in Iowa Code section 216.19(4) that "nothing" in the ICRA could be construed to prohibit local agencies from developing adequate remedies. Third, *Toppert* does not mention Iowa Code section 216.18(1), which instructs courts that the ICRA should be "construed broadly to effectuate its purpose." Indeed, there is little persuasive reasoning in the opinion. An appeal to such flawed federal authority betrays the weakness of the majority's position. To paraphrase what has been attributed to Thomas Acquinas, proof based upon mere authority of the speaker is the weakest kind of proof. Thomas Aquinas, *Summa Theologiæ*, Question 1, Art. 8, Objection 2., http://www.u.arizona.edu/~aversa/scholastic/st_q1.html.

### III. Conclusion.

In sum, by ignoring the historic challenges of providing adequate remedies in civil rights legislation, and ignoring important statutory language in Iowa Code sections 216.18(1), 216.19(1), and (4), the majority

rewrites the statute and truncates the enforcement mechanisms of local civil rights ordinances.

Further, under the majority approach, a local civil rights complainant would risk being locked in a bureaucratic closet by a local commission. Indeed, the private enforcement option is designed in part to avoid *precisely* the kind of result that happened here: after three years of delay, the local agency finds probable cause and then the agency refuses to launch an enforcement action. This case is exhibit A for showing why the legislature added a private cause of action to the ICRA and insisted that local agencies provide the same rights and remedies as the ICRC, including a right to sue. By incorporating a private right of action, the local Davenport ordinance fulfilled the legislature's purpose and ensured the principle in *Marbury* that a person who suffers a legal wrong is not left without a remedy. Here, Petro has a claim which the staff of the DCRC believed established probable cause, but Petro's claim is left high and dry by the majority, withering away based on a narrow interpretation of the ICRA.

For the above reasons, I would therefore conclude that while Petro must show that district court jurisdiction was authorized by state law, Iowa Code section 216.19(4) provides the necessary statutory foundation for district court jurisdiction of claims arising out of local civil rights commissions where an administrative release and a right-to-sue letter have been obtained. The district court thus erred in dismissing Petro's claims based on alleged violations of the Davenport Municipal Code. I therefore dissent to division III of the majority opinion and would reverse and remand for further proceedings.